ORIGINAL

Approved: _____  15 MAG 1927
JENNIFER LANE GACHIRI
Assistant United States Attorney

Before: HONORABLE FRANK MAAS
Chief United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :  **SEALED COMPLAINT**

    - v. -                            :  Violations of
                                         18 U.S.C. §§ 2320 and 2
CARLOS RENE TSE,                  :
    a/k/a "Leo,"                        COUNTY OF OFFENSE:
                                  :  NEW YORK
             Defendant.
                                  :

- - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    VINCENT M. MAZZULLI, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and charges as follows:

COUNT ONE
(Trafficking in Counterfeit Goods)

    1.  From at least on or about May 15, 2014, up to and including at least on or about October 9, 2014, in the Southern District of New York and elsewhere, CARLOS RENE TSE, a/k/a "Leo," the defendant, knowingly and intentionally did traffic and attempt to traffic in goods and services, and did knowingly use a counterfeit mark on and in connection with such goods and services, to wit, TSE was employed at a store in New York, New York from which he sold numerous counterfeit designer handbags.

    (Title 18, United States Code, Sections 2320(a)(1) and 2.)

    The bases for my knowledge and the foregoing charges are, in part, as follows:

    2.  I am a Special Agent with HSI and I have been personally involved in the investigation of this matter. This

affidavit is based upon my own observations, conversations with other law enforcement agents and others, and my examination of reports and records prepared by others. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise expressly indicated.

     3.    Based on my conversations with the owner ("Owner") of a private security company ("Company-1"), and my review of reports prepared by private investigators ("PIs")[1] whom the Owner employs, I have learned the following:

          a.    In or about August 2014, Company-1 advised HSI of an ongoing undercover investigation that it was conducting into the importation and sale of counterfeit luxury goods, including goods purporting to be designer handbags. Based upon information gathered during the course of the investigation to date, other HSI agents and I believe that these goods are imported into the United States from China, and are subsequently sold by a brick and mortar retailer. The investigation has resulted in the identification of a retailer at which the counterfeit goods at issue are sold.

          b.    In or about August 2014, the Owner informed me that the PIs had identified a store, located in the vicinity of 271 Canal Street, New York, New York ("Store-1"), which was believed to be engaged in the sale of counterfeit designer goods. In particular, based upon their training and experience, the PIs observed that Store-1 sold, among other things, counterfeit Louis Vuitton ("LV") handbags.

          c.    From my review of a report prepared by employees of Company-1, and my conversations with the Owner, I know that on or about December 12, 2013, the PIs, under the direction of the Owner, visited Store-1 to negotiate the purchase of

---

[1] The PIs are employed by Company-1, which is retained by a number of luxury brand companies, including Louis Vuitton, to determine the authenticity of goods purporting to be manufactured by those companies. Based upon their training and experience, the PIs are able to determine whether a particular item is authentic or counterfeit upon inspecting such item.

counterfeit designer handbags. One of the PIs was outfitted with both audio and video recording equipment. Additional PIs ("PI-2s") conducted surveillance of the area on foot. On this occasion, CARLOS RENE TSE, a/k/a "Leo," the defendant, introduced himself to the PIs as "Leo." One of TSE's fellow employees then directly sold the PIs a counterfeit LV handbag ("Handbag-1") and a counterfeit LV wallet ("Wallet") at Store-1 for a total of $380.00 in Company-1 funds. Representatives of the Intellectual Property Department of LV North America ("LV IP") subsequently confirmed that Handbag-1 and the Wallet are counterfeit merchandise.

        d.    From my review of a report prepared by employees of Company-1, and my conversations with the Owner, I know that on or about May 15, 2014, the PIs, under the direction of the Owner, again visited Store-1 to negotiate the purchase of additional counterfeit designer handbags. One of the PIs was outfitted with both audio and video recording equipment and was provided with Company-1 funds, and PI-2s conducted surveillance of the area on foot. On this occasion, TSE approached the PIs, who placed an order with TSE for one counterfeit LV handbag ("Handbag-2"). After TSE brought Handbag-2 to the PIs, they paid him $200.00 in Company-1 funds. TSE then placed Handbag-1 in an opaque, black plastic bag. LV IP subsequently confirmed that Store-1 is not authorized to sell LV merchandise, and that Handbag-2 is counterfeit merchandise.

        e.    From my review of a report prepared by employees of Company-1, my conversations with the Owner, and a partial transcript of contemporaneous audio and video surveillance recordings, I know that on or about May 29, 2014, the two PIs again visited Store-1 to negotiate the purchase of additional counterfeit designer handbags. One of the PIs was outfitted with both audio and video recording equipment, and PI-2s conducted surveillance of the area on foot. On this occasion, TSE, who continued to use the name "Leo," approached the PIs and asked if they were interested in purchasing handbags. TSE then asked the PIs to select a handbag from an electronic catalog that he displayed on his iPad. After the PIs selected a handbag, TSE explained that Store-1's handbags were stored in two locations ("Storage Spaces") in the New York area. TSE placed a telephone call to an unidentified person and, approximately twenty minutes later, met an unidentified person outside of Store-1. Shortly thereafter, TSE handed the PIs a blue plastic bag containing a counterfeit LV handbag ("Handbag-3").

    f. From my review of a partial transcript of contemporaneous audio and video surveillance recordings, I know that on or about May 29, 2014, TSE made the following statements to the PIs, in sum and substance, in connection with the sale of Handbag-3.  TSE instructed the PIs to face away from Store-1's entrance while inspecting handbags, which he maintained inside of a plastic bag.  TSE explained that one cannot publicly display counterfeit goods, and that he would need to sell the handbags quickly in order to avoid getting in trouble with the cops.  TSE added that Store-1's owner was nervous about being fined.  However, TSE stated that he had grown accustomed to the adrenaline associated with his "risky" business.  Ultimately, TSE sold the PIs Handbag-3 for $280.00.  LV IP subsequently confirmed that Handbag-3 is counterfeit merchandise.

    g. From my review of a report prepared by employees of Company-1, my conversations with the Owner, and my review of a partial transcript of contemporaneous audio and video surveillance recordings, I know that on or about July 17, 2014, the two PIs again visited Store-1 to negotiate the purchase of additional counterfeit designer handbags.  One of the PIs was outfitted with both audio and video recording equipment, and PI-2s conducted surveillance of the area on foot.  On this occasion, in sum and substance, TSE advised the PIs that transporting the counterfeit designer handbags from the Storage Spaces to Store-1 would risk exposing Store-1's location to "operatives."  Accordingly, in an effort to be "creative," TSE asked the PIs to meet a fellow employee (the "Runner") of Store-1 at a nearby Starbucks (the "Starbucks"),[2] to which the Employee would bring the counterfeit designer handbags.  TSE added that "they" — representatives of companies including LV — were watching and checking local stores.  According to TSE, "they" wanted to "ticket" — that is, to fine — the sellers of counterfeit goods.  TSE therefore warned the PIs that he had to make efforts to conceal the bags, and that the PIs would need to be careful.  The PIs then walked to the Starbucks, where the Runner directed them to inspect the handbag they had selected inside of the Starbucks' bathroom.  However, because the PIs preferred a smaller handbag, they and the Runner returned to Store-1.  While inside of Store-1, one of the PIs purchased a counterfeit LV handbag ("Handbag-4") directly from TSE for

---

[2] The Starbucks was located in the vicinity of 405 Broadway in New York, New York.

$250.00.  LV IP subsequently confirmed that Handbag-4 is counterfeit merchandise.

       h.  From my review of a report prepared by employees of Company-1, I know that on or about July 24, 2014, PI-2s conducted surveillance of TSE.  They observed TSE exit Store-1 and, later that day, enter a residence in the vicinity of 36 Bay 19th Street, Brooklyn, New York ("TSE Residence").

       i.  From my review of a report prepared by employees of Company-1, and my conversations with the Owner, I know that on or about September 24, 2014, the two PIs again visited Store-1 in order to negotiate the purchase of additional counterfeit designer handbags.  One of the PIs was outfitted with both audio and video recording equipment, and PI-2s conducted surveillance of the area on foot.  The PIs selected a counterfeit LV "Capucine" handbag ("Handbag-5") to purchase, and paid $500.00 directly to CARLOS RENE TSE, a/k/a "Leo."  TSE's fellow Store-1 employee handed the PIs an opaque, black plastic bag containing Handbag-5.  LV IP subsequently confirmed that Handbag-5 is counterfeit merchandise.

    4.  On or about September 17, 2014, another law enforcement officer and I visited the TSE Residence and spoke with a woman who stated that she resides in Apartment #1 ("Female-1").  "Female-1" informed us that two other individuals resided at that location, and provided us with two pieces of mail matter bearing the name of "CARLOS TSE" and another woman ("Female-2"), as well as the TSE Residence address.  Female-1 stated that TSE was her son, and that Female-2 was her daughter-in-law.  She added that TSE works on Canal Street in New York, and sells handbags.

       a.  A law enforcement database search for the name "Carlos TSE" revealed that TSE's primary address is the TSE Residence address.  Moreover, employees of the U.S. Postal Service confirmed that TSE receives mail at that address.

       b.  My review of phone records revealed that a cellular number for which "Carlos TSE" is the designated subscriber is associated with the TSE Residence address.

5.      From my review of a November 18, 2014 report prepared by employees of a consulting company ("Company-2"), I know that on or about October 7, 2014, a consultant ("Consultant-1") employed by Company-2 visited Store-1 to negotiate the purchase of one counterfeit LV handbag ("Handbag-6") and one pair of counterfeit LV sunglasses (the "Sunglasses").  CARLOS RENE TSE, a/k/a "Leo," offered to e-mail to Consultant-1 a hyperlink featuring his merchandise.

6.      From my review of e-mail exchanges between CARLOS RENE TSE, a/k/a "Leo," and Consultant-1, I know that, on or about October 9, 2014, TSE e-mailed Consultant-1 by using the username "Leo NYC Luxury."  The e-mail included a link to a website that offered for sale, among other things, Handbag-6 and the Sunglasses.  TSE directed Consultant-1 to wire payment for these items — a total of $515.00 — to a designated Bank of America bank account ("the Account").  Based upon my review of bank records, I know that the Account is a corporate business account for "NYC Luxury Inc."  The Account's designated users are TSE and Female-2, and it is associated with the TSE Residence.  NYC Luxury Inc. is registered with the Department of State under Store-1's address.

7.      From my review of text message exchanges between TSE and Consultant-1, I know that, on or about October 14, 2014, Consultant-1 wired approximately $515.00 to the Account, and subsequently received Handbag-6 and the Sunglasses by mail from China.  LV IP later confirmed that Handbag-6 is counterfeit merchandise.

8.      I have compared the photograph on TSE's New York State Identification Card with photographs culled from video surveillance conducted by the PIs at Store-1 on or about May 15, May 29, July 24, and September 24, 2014.  These photographs and video all appear to depict the same person.

        WHEREFORE, deponent prays that warrants be issued for

the arrest of CARLOS RENE TSE, a/k/a "Leo," the defendant, and that he be arrested, detained or bailed as the case may be.

VINCENT M. MAZZULLI
Special Agent
HSI

Sworn to before me this 5th day of June, 2015.

THE HONORABLE FRANK MAAS
Chief United States Magistrate Judge
Southern District of New York